Karu Gene WHITE, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

2013–SC–000791–MR

Supreme Court of Kentucky.

RENDERED: MAY 5, 2016

Rehearing Denied October 20, 2016

MODIFIED: October 20, 2016

ON APPEAL FROM POWELL CIRCUIT COURT, HONORABLE JOHN DAVID CAUDILL, JUDGE, NO. 79–CR–00024

COUNSEL FOR APPELLANT: Margaret O'Donnell, David Michael Barron, Assistant Public Advocate

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Susan Roncarti Lenz, Assistant Attorney General

### OPINION OF THE COURT BY JUSTICE CUNNINGHAM

This is a death penalty case where the Appellant, Karu Gene White ("White"), raises a post-conviction intellectual disability claim.[1] For the reasons stated herein, we remand this case to the trial court to order the Kentucky Correctional Psychiatric Center ("KCPC") to perform a psychological evaluation of Mr. White.

### Factual and Procedural Background

In 1980, White was convicted by a Powell Circuit Court jury of three counts of capital murder, three counts of first-degree robbery, and one count of burglary. He was sentenced to death for each of the three murders. Less than a month after he was sentenced, White was subjected to a psychological evaluation by a "Contract Psychologist," Henry S. Davis, Ph.D. Dr. Davis determined that White had an overall intelligence quotient (IQ) score of 81. We affirmed White's convictions and sentences in *White v. Commonwealth*, 671 S.W.2d 241 (Ky.1983), *cert. denied*, 469 U.S. 963, 105 S.Ct. 363, 83 L.Ed.2d 299

---

1. Previous opinions of this Court have employed the term "mental retardation." In keeping with the most recent Federal case law, we will now employ the term "intellectual disability" when referencing Mr. White's claim.

(1984). White's psychological evaluation was not raised as an issue in his direct appeal and we did not address it in our opinion. White's subsequent RCr 11.42 motion was denied. That denial was also affirmed on appeal.

In 2004, White filed a motion in the Powell Circuit Court pursuant to RCr 11.42, CR 60.02, and CR 60.03 to set aside his death sentences on the grounds that he is intellectually disabled. These motions were based on the U.S. Supreme Court's decision in *Atkins v. Virginia*, which held that the execution of an intellectually disabled person violates the Eighth Amendment of the United States Constitution. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). White's case was assigned to Special Judge Lewis Paisley.

It appears that White's evaluation by Dr. Davis was not considered by the trial court in ruling on these motions. It is critical to note, however, that only offenders with IQ scores of 70 or less are barred from execution under KRS 532.140 and KRS 532.130. White's IQ score of 81 was well above that threshold. But *see Hall v. Florida*, ― U.S. ―, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014) (applying Eighth Amendment bar against executing persons with intellectual disability). The application of *Hall* to the present case will be discussed later in our analysis.

### White's Post Conviction Claim

We will first discuss the factual and procedural posture of White's post-conviction intellectual disability claim. Judge Paisley was the first of three judges to address that claim. In an order entered on April 26, 2006, Judge Paisley ordered the Finance and Administration Cabinet to pay up to $5,000.00 for a mental health evaluation by an expert of White's choosing.

The Commonwealth sought a writ of prohibition seeking to prevent enforcement of Judge Paisley's order. Because this is a death penalty case, the writ was required to be filed in this Court. *Skaggs v. Commonwealth*, 803 S.W.2d 573, 577 (Ky.1990). We granted the Commonwealth's writ and held that the trial court abused its discretion by ordering the Finance and Administration Cabinet to pay up to $5,000.00 for a private psychologist "without the requisite showing that use of a state facility is somehow impractical" as provided in KRS 31.185. *Commonwealth v. Paisley*, 201 S.W.3d 34, 37 (Ky.2006).

The case was reassigned to Special Judge Gary Payne on remand. On January 31, 2008, Judge Payne held an evidentiary hearing on the matter during which several witnesses testified. White also presented the court with sworn declarations from several experts concerning KCPC's inability to conduct the necessary evaluations. After considering all of the evidence, Judge Payne determined that KCPC "is capable of providing a competent mental retardation evaluation of White, pursuant to KRS 532.130." The court also ordered White to submit to KCPC's custody for evaluation. White sought a writ prohibiting enforcement of Judge Payne's order. We denied White's petition and instructed the trial court to apply the standard set forth in *Mills v. Messer*, 268 S.W.3d 366 (Ky.2008). *White v. Payne*, 332 S.W.3d 45, 49 (Ky.2010). The guideline established by *Mills* was simply whether the expert was "reasonably necessary" for the defendant's case. On that issue, we stated as follows:

*Mills* was rendered prior to Judge Payne's order denying private funding, but it is unclear whether he gave proper consideration to *Mills*. Thus, upon recommencement of the circuit court proceedings, the court should, as a threshold matter, apply the *Mills* standard for

an examination of whether the testimony of a mental retardation expert is *reasonably necessary* for a full presentation of the *White's* case. If so, such an expert should be appointed. If not, the KCPC evaluation should proceed pursuant to Judge Payne's existing order. *Id.* at 49. (Emphasis added).

After considering White's argument on remand, Judge Payne, in an order entered on December 12, 2011, held that "White has not shown that [an intellectual disability] expert selected by White is reasonably necessary for a full presentation of his case." [2] Because White had previously refused to cooperate with the KCPC evaluation, the court also ordered that any failure to cooperate in the future would constitute a waiver/forfeiture of White's intellectual disability claim. White filed a motion to reconsider that order and subsequently refused to cooperate with the KCPC evaluation. Judge Payne retired without ruling on the motion to reconsider.

Chief Regional Judge John David Caudill designated himself to preside over this matter. White filed a supplemental memorandum in support of his argument. In an order entered on July 31, 2013, Judge Caudill addressed White's motion to alter, amend or vacate Judge's Payne's previous order denying White's request for funding. In addressing that issue, Judge Caudill considered the reasonableness standard set forth in *Mills* and found that KCPC was competent to perform White's evaluation. Judge Caudill also determined that "any order requiring such an evaluation could be structured to protect any constitutional rights." Therefore, the court ordered that White was not entitled to state funds for a psychological evaluation.

After White indicated that he would continue to refuse evaluation by KCPC, the trial court determined that he had waived his intellectual disability claim in an order entered on November 1, 2013. In that order, the court also denied White's pending motion for a protective order and further ordered that White's case be dismissed. The court designated its ruling as a final and appealable order with no just cause for delay. White raises five primary arguments on appeal. Each will be discussed in turn.

### KRS 31.185

For his first argument, White contends that KRS 31.185 requires an independent confidential defense evaluation. That statute provides in relevant part:

(1) Any defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth. If he or she considers their use impractical, *the court* of competent jurisdiction in which the case is pending *may authorize* the use of private facilities to be paid for on court order from the special account of the Finance and Administration Cabinet. (Emphasis added).

Nothing in this provision *requires* the use of private psychological evaluations to be paid for with public funds. That determination is within the discretion of the trial court. White also cites the U.S. Supreme Court case of *Atkins v. Virginia* in support of his argument. However, *Atkins* does not require the use of public funds to pay for private facilities in post-conviction proceedings. Compare *Binion v. Commonwealth*, 891 S.W.2d 383 (Ky.1995) (holding that the court's appointment of a

---

**2.** The order also stated that "[t]he parties agreed that a hearing was not necessary and

the issue could be decided based upon the [ ] pleadings and documents."

neutral mental health expert was insufficient to satisfy the due process requirement that an indigent defendant be provided the services of a private mental health expert).

The purpose of our decisions in *Mills* and *Paisley,* as applied by our 2010 decision of *White v. Payne,* was to craft and implement a standard governing requests for funding post-conviction mental retardation evaluations. This is well within our authority under *Atkins. See also Bowling v. Commonwealth,* 377 S.W.3d 529 (Ky. 2012) (establishing procedure for evaluating post-conviction claims under *Atkins* ). To further clarify, none of the additional cases cited by White throughout his briefs *require* this Court to authorize the type of post-conviction funding at issue here.

■ The primary issue here is whether the trial court properly implemented *White v. Payne* —our most recent case concerning White's intellectual disability claim. We held in *Payne* that the "impractical use" standard in *Paisley* "must now be applied in conjunction with the standard advanced by *Mills v. Messer,* 268 S.W.3d 366 (Ky.2008)[.]" *Payne,* 332 S.W.3d at 49. As previously discussed, the *Mills* standard is "whether the testimony of [an intellectual disability] expert is reasonably necessary for a full presentation of the White's case." *Id.* at 49. Thus, the trial court must determine whether the KCPC evaluation is impractical *and* whether a private expert is reasonably necessary.

Although Judge Caudill did not specifically address whether the use of KCPC facilities and personnel was impractical in this instance, we have previously held that a similar omission by Judge Payne was not fatal. *Id.* Like in *Payne,* "we construe [Judge Caudill's] finding as the functional equivalent of a finding that the use of KCPC is not impractical, and thus a mental evaluation by the facility is not precluded by KRS 31.185(1)." *Id.*

■ We must now determine "whether the testimony of [an intellectual disability] expert is reasonably necessary for a full presentation of the White's case." *Id.* at 49 (citing *Mills,* 268 S.W.3d at 367). Judge Caudill answered that question in the negative. We review this determination for an abuse of discretion. *Mills,* 268 S.W.3d at 367 ("[t]he trial court still maintains the discretion to deny such funds if it determines that the expert testimony is not reasonably necessary").

It is first necessary to reiterate the type of examination for which White is seeking public funds:

> The anticipated procedure is that KCPC will perform an objectively neutral mental retardation evaluation to assess White's eligibility for execution. As described in the record, this will principally involve an IQ test, interviews with White, and a review of his background. The aim of these tests, interviews, and reviews will be to assess White's IQ level for a determination of whether he is mentally retarded. *Payne,* 332 S.W.3d at 50.

The record indicates that Judge Payne was presented with a considerable amount of evidence, including the testimony of Dr. Steven Simon, the Director of KCPC's Psychology department. Dr. Simon testified that he often performed these types of evaluations. He also testified that the evaluation would provide testing for adaptive behavioral skills and background investigations. Like Judge Payne, Judge Caudill also considered the record before him, as well as White's supplemental briefing on this issue. Based on the facts presented, we conclude that the trial court properly observed the standard set forth in *Payne* and did not abuse its discretion.

### *Waiver and the Application of Hall v. Florida*

If our Court was the final say concerning death penalty sentencing in this state, this opinion would be coming to an end. Of course, that is not the case. We have long been mandated to follow the dictates of the U.S. Supreme Court concerning the trial and imposition of sentences in death penalty prosecutions.

We cannot consider this case independently of the implications of the 2014 U.S. Supreme Court decision of *Hall v. Florida,* —— U.S. ——, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). That case held the Florida Supreme Court's reading of that state's fixed IQ cutoff score violated the Eighth Amendment. The holding in *Hall* has been aptly summarized by the United States Court of Appeals for the Fourth Circuit as follows:

> The *Hall* Court explained that a state's assessment of a defendant's intellectual disability should focus on whether he evidenced, beginning "during the developmental period," both (1) "significantly subaverage intellectual functioning," and (2) "deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances)." The Court emphasized that these two criteria are "interrelated" and that no "single factor [is] dispositive." Accordingly, "an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." *Prieto v. Zook,* 791 F.3d 465, 468 (4th Cir.2015) (internal quotation marks and citation omitted).

The *Hall* Court observed that "[o]nly the Kentucky and Virginia Legislatures have adopted a fixed score cutoff identical to Florida's." *Hall,* 134 S.Ct. at 1996. However, the Court stated that "[o]n its face this statute could be interpreted consistently with *Atkins* and with the conclusions this Court reaches in the instant case. Nothing in the statute precludes Florida from taking into account the IQ test's standard error of measurement..." *Id.* at 1994. We acknowledge that "[c]ourts must recognize ... the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance.... [A] State must ... understand that an IQ test score represents a range rather than a fixed number." *Id.* at 2001.

In light of the Supreme Court's declaration in *Hall* that "[a]n IQ score is an approximation, not a final and infallible assessment of intellectual functioning, ... when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 2000-2001. Therefore, trial courts in Kentucky must consider an IQ test's margin of error. And if the IQ score range produced by such consideration implicates KRS 532.130, KRS 532.140, and other relevant statutory provisions, the trial court must consider additional evidence of intellectual disability. Applying the IQ score referenced in those provisions as the dispositive factor in determining eligibility for execution without considering the test's margin of error violates the Eighth Amendment.

So, the obvious question looms before us. How, if at all, does the sea change in *Hall* affect the claim of Karu Gene White, the Appellant in this case?

The retroactive application of U.S. Supreme Court cases is governed by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Teague* held that "[u]nless they fall within an exception to

the general rule, *new constitutional rules of criminal procedure* will not be applicable to those cases which have become final before the new rules are announced." *Id.* at 310, 109 S.Ct. 1060. (Emphasis added). *Teague* dealt the criminal procedure of jury selection as it was interpreted by *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This Court has previously applied *Teague* in *Leonard v. Commonwealth,* 279 S.W.3d 151 (Ky. 2009). The issue in *Leonard* was whether the rule announced in *Martin v. Commonwealth* should be enforced retroactively. 207 S.W.3d 1 (Ky.2006). *Martin,* dealing with the rule of criminal procedure 11.42, held that offenders are not precluded from successfully maintaining an ineffective assistance of counsel claim based on an alleged error that an appellate court, on direct appeal, had previously decided was not palpable. *Id.*

We held that the rule in *Martin* was a "new rule" and, therefore, did not apply retroactively. The rule in *Martin* was not to be applied retroactively because "instead of 'clarifying the law,' *Martin* established a new rule." *Leonard,* 279 S.W.3d at 161.

▬ Applying this standard to the present case, unlike *Teague, Leonard* or *Martin,* the 2014 U.S. Supreme Court case of *Hall,* does not deal with criminal procedure. It is "a substantive restriction on the State's power to take the life" of individuals suffering from intellectual disabilities. *See Atkins,* 536 U.S. at 321, 122 S.Ct. 2242 (quoting *Ford,* 477 U.S. at 405, 106 S.Ct. 2595). We are dealing here with a U.S. Supreme Court directive that not only proscribes intellectually disabled people from being put to death, but defines the manner in which the mental deficiencies of offenders must be evaluated. Therefore, *Hall* must be retroactively applied. In so holding, we are in the compa-

ny of our sister state Florida which, of course was the state in which the underlying issue in *Hall* first arose. *See Oats v. Florida,* 181 So.3d 457 (2015).

▆ Now we must address whether White's continued failure to submit to KCPC's custody constitutes waiver. Simply put, offenders who raise successful claims under *Atkins* and *Hall* are barred from execution. KRS 532.140. This protection to the condemned endures to the very moment of execution, in the same manner as the Eighth Amendment bars a state from carrying out a sentence of death upon the insane. Furthermore, KRS 532.135 places the burden on the defendant to demonstrate intellectual disability and requires the defendant to present evidence to that effect. By continuing to refuse to be examined, to his great risk of not being spared, he simply fails in proving his ineligibility for the death sentence. However, he does not waive such a claim in the normal sense that we know that term.

▆ To summarize succinctly, we do not hold today that because of *Hall* every inmate in Kentucky under the sentence of death is entitled to an evaluation or a hearing on the issue of serious intellectual disability. Nor do we hold that White is entitled to either an evaluation or hearing. That determination was made early in this case by Judge Paisley and has not been altered nor made a topic of this appeal. Only the mode of examination has been contested.

▆ Common sense dictates that there must be a prima facie showing that there is a reasonable basis to believe that the movant suffers from a serious intellectual disability. Some, if not most, of those currently condemned to be executed possess average to above average intellectual ability. We anticipate that a sufficient

showing for a hearing and examination would resemble closely that procedure established by KRS 532.135 for pre-trial mental examination. What we do hold today is that once an evaluation has been ordered for the purpose of determining intellectual disability, then the evaluation must meet the dictates of *Hall* White's protestation notwithstanding, the record reflects ample evidence that KCPC is capable of examining and evaluating White accordingly. White shall have the benefit of our decision here today in opting to proceed with the examination.

### Statutory Authorization

■ White also contends that KCPC is not statutorily authorized, under KRS 504.080 and its accompanying provisions, to conduct post-conviction psychological evaluations. This argument is without merit. Although KCPC's primary mission may be to evaluate pre-trial detainees and to treat post-conviction prisoners, our decision in *Payne* clearly indicates that KCPC is authorized to perform post-conviction psychological evaluations.

### Constitutional Claims

■ White further argues that the U.S. and Kentucky Constitutions require an independent evaluation by an expert of his choosing. White has previously raised similar constitutional arguments in *Payne*. However, *Payne* was a writ action and, therefore, did not address the merits of White's constitutional arguments. Nevertheless, we prospectively opined that there was "no realistic threat to White's 'state and federal constitutional rights to confidential defense communications' as a result of a KCPC evaluation." *Payne*, 332 S.W.3d at 50. We specifically noted that:

> White's Fifth Amendment right to remain silent will be minimally implicated, if at all. He has been tried and convict-

ed of the three murders that resulted in his death sentence, and so any inquiry by the mental health professionals into these crimes would not implicate the right. *Id.* at 51.

These determinations remain sound, and we adopt that reasoning here. White also contends that our relevant case law on this matter violates the Eighth Amendment. That argument is derivative of the U.S. Supreme Court's decisions in *Atkins* and *Hall.* We have already addressed the constitutional implications of both cases, neither of which requires expert funding.

It is critical to reiterate, however, that "upon proper motion by trial counsel, safeguards may be implemented by the trial court to protect any confidential defense communications as due process may require." *Payne*, 332 S.W.3d at 50. Moreover, "if, as part of the evaluation and testing, it becomes necessary for White to discuss other crimes he may have committed … the trial court may impose appropriate safeguards to prevent KCPC from divulging this information to the Commonwealth." *Id.* at 51. Thus, based on the framework advanced by *Paisley, Mills, Payne*, and the additional safeguards available at the trial court level, we find no constitutional violation here.

### Ex Parte Hearings

■ Finally, White argues that KRS 31.185(2) mandates that all future discussions with the trial court shall be conducted ex parte. That provision provides as follows:

> The defending attorney may request to be heard ex parte and on the record with regard to using private facilities under subsection (1) of this section. If the defending attorney so requests, the court *shall* conduct the hearing ex parte and on the record. (Emphasis added).

Since we have previously held that KRS 31.185(1) applies in this case, it logically follows that Section 2 applies as well. However, this statute is of minimal relevance here because the trial court has already determined that an evaluation by private experts is not necessary. The only issue that remains on remand is whether Mr. White will submit to the custody of KCPC. Thus, ex parte hearings are unnecessary.

## Conclusion

For the foregoing reasons, we hereby affirm the judgment of the Powell Circuit Court finding that White is not entitled to public funds for an expert of his choosing. We reverse the judgment of the Powell Circuit Court on the issue of waiver and remand this Case to the trial court to conduct proceedings consistent with this opinion.

All sitting. Minton, C.J.; Hughes, Keller, Noble, and Venters, JJ., concur. Wright, J., concurs with separate opinion.

WRIGHT, J., CONCURRING:

The trial court ruled that if Appellant refuses to participate in the evaluation, then he will be deemed to have waived the issue. However, the trial court has an additional option: use of the 1980 IQ test. If the court finds that the 1980 test was valid, then it does provide some information for use in evaluating this issue. The Psychological Association's brief in the United States Supreme Court case *Hall v. Florida*, —— U.S. ——, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), said a person's score would likely differ by five points, plus or minus, with 95% confidence. Using that confidence range, Appellant's true IQ based on the score obtained in 1980 of 81 would likely result in an IQ of 76 to 86—some six points above the cutoff of 70.