CORRECTED: DECEMBER 13, 2018
RENDERED: JUNE 14, 2018
TO BE PUBLISHED



§upreme Court of Kentucky

2017-SC-000171-MR

ROBERT KEITH WOODALL      APPELLANT

ON APPEAL FROM CALDWELL CIRCUIT COURT
V.     HONORABLE CLARENCE A. WOODALL III, JUDGE
NO. 97-CR-00053

COMMONWEALTH OF KENTUCKY      APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**REVERSING AND REMANDING**

Robert Keith Woodall was convicted and sentenced to death nearly twenty years ago for the kidnapping, rape, and murder of a teenage girl. Today we consider Woodall's appeal from the trial court's denial of his recent post-conviction motion requesting that the trial court declare him to be intellectually disabled, which would preclude the imposition of the death penalty.

Upon consideration of the United States Supreme Court's precedent precluding the imposition of the death penalty upon intellectual disabled persons, we hold that Kentucky Revised Statute (KRS) 532.130(2), a statute with an outdated test for ascertaining intellectually disability, is unconstitutional under the Eighth Amendment to the United States Constitution. Accordingly, we reverse the trial court's denial of Woodall's motion and remand this case to the trial court to conduct a hearing, make

findings, and issue a ruling on the issue of Woodall's potential intellectual disability following this Court's and the U.S. Supreme Court's guidelines on such a determination, especially as espoused in *Moore v. Texas*.[1]

## I. BACKGROUND.

Woodall pleaded guilty to murder, rape, and kidnapping and a jury recommended a sentence of death, which the trial court adopted. Extensive collateral-attack litigation followed. Eventually, Woodall filed a Kentucky Rules of Civil Procedure ("CR") 60.02 and 60.03 motion, alleging that he is intellectually disabled and that the imposition of the death penalty upon him is unconstitutional.[2] Woodall also sought expert funding in that motion. The Commonwealth responded, and the trial court granted Woodall's motion for expert funding.

Woodall then replied with an expert's contemporaneous opinion that Woodall is intellectually disabled. After another response from the Commonwealth and reply from Woodall, the trial court denied Woodall's motion without conducting a hearing, upholding Woodall's death sentence. Woodall then appealed the trial court's denial of his motion to this Court, seeking either (1) a reversing of the trial court's decision and a hearing to plead his case for intellectual disability or (2) a final determination by this Court that he is intellectually disabled, which would preclude the imposition of the death penalty.

---

[1] 137 S.Ct. 1039 (2017).

[2] The United States Supreme Court in *Atkins v. Virginia* held that the execution of a person suffering from an intellectual disability is unconstitutional, because it violates the Cruel and Unusual Punishment Clause of the Eighth Amendment of the United States Constitution. 536 U.S. 304, 321 (2002).

# II. ANALYSIS.

The Eighth Amendment of the United States Constitution[3] prohibits the execution of a person who has an intellectual disability.[4] The U.S. Supreme Court expounded on this rule in *Hall v. Florida,* where it held unconstitutional Florida's strict and rigid determination as to whether an individual has an intellectual disability.[5] Specifically, Florida's highest court in *Cherry v. State* "held that a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited."[6] The U. S. Supreme Court held that a rigid and bright-line rule like Florida's was unconstitutional.[7]

The U.S. Supreme Court in *Hall* specifically mentioned Kentucky law: "Only the Kentucky and Virginia Legislatures have adopted a fixed score cutoff identical to Florida's."[8] The Court in *Hall* cited to KRS 532.130(2),[9] which states:

> A defendant with significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period is referred to in KRS 532.135 and 532.140[10] as a defendant with a serious intellectual disability. "Significantly subaverage general intellectual

---

[3] Specifically, the Cruel and Unusual Punishment Clause, has been incorporated into state law by the Fourteenth Amendment. *Miller v. Alabama,* 567 U.S. 460, 503 (2012).

[4] *Hall v. Florida,* 134 S.Ct. 1986, 1990 (2014); *Atkins v. Virginia,* 536 U.S. 304, 321 (2002).

[5] 134 S.Ct. at 2001.

[6] 959 So.2d 702, 712-13 (Fla. 2007); *Hall,* 134 S.Ct. at 1994.

[7] *Hall,* 134 S.Ct. at 1994.

[8] *Id.* at 1996.

[9] *Id.*

[10] KRS 532.140(1) states in relevant part, "[N]o offender who has been determined to be an offender with a serious intellectual disability...shall be subject to execution."

functioning" is defined as an intelligence quotient (I.Q.) of seventy (70) or below.

This Court in *Bowling v. Commonwealth*, decided before the benefit of *Hall*, interpreted KRS 532.130(2), finding that "[t]he General Assembly's adoption of a *bright-line maximum IQ of 70 as the ceiling for mental retardation* 'generally conform[s]' to the clinical definitions approved in *Atkins*, thus does not implicate the Eighth Amendment's proscription against 'cruel and unusual' punishment.... [W]e decline to rewrite this unambiguous statute."[11]

This Court in *White v. Commonwealth*,[12] considering the U.S. Supreme Court's decision in *Hall*, expounded on this issue, holding that "trial courts in Kentucky must consider an IQ test's margin of error. And if the IQ score range produced by such consideration implicates KRS 532.130, KRS 532.140, and other relevant statutory provisions, the trial court must consider additional evidence of intellectual disability."[13] This Court left no doubt that "once an evaluation has been ordered for the purpose of determining intellectual disability, then the evaluation must meet the dictates of *Hall*...."[14]

We considered the application of our intellectual disability statutes again in the post-conviction challenge of defendant Larry Lamont White in *White v. Commonwealth*.[15] There, we stated the trial court's process for determining an intellectual disability:

> In order for a defendant to meet Kentucky's statutory definition of "serious intellectual disability," and thus evade the death penalty,

---

[11] 163 S.W.3d 361, 376 (Ky. 2005) (emphasis added).

[12] This case involved the defendant Karu Gene White's post-conviction challenge to a sentence of death.

[13] 500 S.W.3d 208, 214 (Ky. 2016).

[14] *Id.* at 216.

[15] *White v. Commonwealth*, 544 S.W.3d 125 (Ky. 2017).

he or she must meet the following criteria pursuant to KRS 532.135: (1) the defendant' intellectual functioning must be "significantly subaverage"—defined by statute as having an intelligence quotient of 70 or less; and (2) the defendant must demonstrate substantial deficits in adaptive behavior, which manifested during the developmental period.

*Procedurally, trial courts require a showing of an IQ value of 70 or below before conducting a hearing regarding the second criteria of diminished adaptive behavior.*[16]

The two *White* cases show a restriction in Kentucky on the defendant's ability to attain intellectual-disability status to prevent the consideration of the death penalty on the finding that the defendant has an IQ score of 70 or below. While trial courts are required to adjust a defendant's IQ score for the standard error of measurement,[17] the bright-line 70-IQ-score finding still appears to be the strict and rigid hurdle that a defendant must surmount before the trial court considers any other evidence.

Recently, the U.S. Supreme Court decided the case of *Moore v. Texas*,[18] giving better, but not much clearer, guidance as to how courts should evaluate this issue. "In *Hall v. Florida,* we held that a *State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70.*"[19] "As we instructed in *Hall,* adjudication of intellectual disability should be 'informed by the views of medical experts.' That instruction cannot sensibly be read to give courts leave to diminish the force of the medical community's consensus."[20] "Even if 'the views of medical experts' do not 'dictate' a court's

---

[16] *Id.* at 152 (emphasis added).

[17] *Id.*; *White*, 500 S.W.3d at 214.

[18] 137 S.Ct. 1039 (2017).

[19] *Moore*, 137 S.Ct. at 1048 (citing *Hall*, 134 S.Ct. at 2000-01) (emphasis added).

[20] *Moore*, 137 S.Ct. at 1044 (citing *Hall*, 134 S.Ct. at 2000).

intellectual-disability determination, we clarified, the determination must be 'informed by the medical community's diagnostic framework.'"[21]

"*Hall* invalidated Florida's strict IQ cutoff because the cutoff took 'an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence.'"[22] "*[W]e do not end the intellectual-disability inquiry, one way or the other, based on [the defendant's] IQ score.*"[23] "The medical community's current standards supply one constraint on States' leeway" in establishing the standards for determining whether a criminal defendant has an intellectual disability.[24]

Admittedly, the U.S. Supreme Court has not provided crystal-clear guidance as to what exactly constitutes a constitutional violation regarding the determination of whether a defendant is intellectually disabled to preclude the imposition of the death penalty. It is also true that the U.S. Supreme Court seems to suggest that a defendant's IQ score, after adjusting for statistical error, acts as the preliminary inquiry that could foreclose consideration of other evidence of intellectual disability, depending on the score.[25]

Two things are clear, however: 1) regardless of some of the statements the U.S. Supreme Court has made, the prevailing tone of the U.S. Supreme

---

[21] *Moore,* 137 S.Ct. at 1048 (citing *Hall,* 134 S.Ct. at 2000).

[22] *Moore,* 137 S.Ct. at 1050 (citing *Hall,* 134 S.C.t at 1995).

[23] *Moore,* 137 S.Ct. at 1050.

[24] *Id.* at 1053.

[25] "Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning." *Moore,* 137 S.Ct. at 1049 (citing *Hall,* 134 S.Ct. at 2001). "...[I]n line with *Hall,* we require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Moore,* 137 S.Ct. at 1049.

Court's examination of this issue suggests that a determination based solely on IQ score, even after proper statistical-error adjustments have been made, is highly suspect; and 2) prevailing medical standards should be the basis for a determination as to a defendant's intellectual disability to preclude the imposition of the death penalty.[26]

As stated above, the U.S. Supreme Court has made some statements, identified in footnote 25 of this opinion, to suggest that a defendant's IQ score, after adjusting for statistical error, forecloses further analysis as to a defendant's potential intellectual disability. We note the Ninth Circuit's discussion of this issue:

> In *Hall*, the Court emphasized that, in death penalty cases where a defendant's intellectual functioning is a close question, the defendant "must be able to present additional evidence of

---

[26] *See State v. Gates*, 410 P.3d 433, 435 (Ariz. 2018) (citing *Moore* for its "holding that states do not have unfettered discretion to reject medical community standards in defining [intellectual disability]"); 9 Ky. Prac. Crim. Prac. & Proc. § 31:32 (5th ed.) (citing *Moore*: "state appellate court 'failed adequately to inform itself of the "*medical community's diagnostic framework*"' and thus abused the discretion it has in enforcing the restrictions on executing the intellectually disabled, noted in *Atkins* and *Hall*"); 9 Minn. Prac., Criminal Law & Procedure § 36:18 (4th ed.) ("For purposes of the death penalty, *medical and psychiatric evidence should be considered in determining mental status, rather than simply an arbitrary numerical I.Q. score* for [intellectual disability].") (citing *Hall* and *Moore*); 15 Colo. Prac., Criminal Practice & Procedure § 20.21 (2d ed.) (citing *Moore*: "the Eighth Amendment requires that the method a state uses to assess a defendant's intellectual disability *must rely on current standards in the medical community*"); Ga. Criminal Trial Practice § 26:6 (2017-2018 ed.) (citing *Moore*: "states do not have 'unfettered discretion' in application of *Atkins*," rather, *states are* "*constrained by [the] medical community's current standards*"); Law of Sentencing § 6:2 (citing *Moore*: "Intellectual disability that precludes a death sentence *should rest on a consensus of the community's expert medical opinion undiminished by judicial formulae*."); 28 Mo. Prac., Mo. Criminal Practice Handbook § 38:8 (citing *Moore* for its "holding that the determination of…intellectual *disability must be governed by 'current medical consensus,' and suggesting that the State's failure to confirm its disability determination to published professional standards will almost certainly invalidate a death sentence.*"); 32 Mo. Prac., Missouri Criminal Law § 57:3 (3d ed.) ("As noted hereinafter, the Missouri statute governing the issue of mental retardation may be inadequate to exempt all persons deemed 'intellectually disabled' under *Atkins*' categorical rule, which has been amplified to emphasize that *the courts' determination of the issue is largely a question of expert consensus*."). We note that numerous other secondary sources also support our conclusion.

intellectual disability...." In fact, in these situations, the court must not "view a single factor as dispositive" given the complexity of intellectual disability assessments. Therefore, a court...must consider all indications of a defendant's intellectual disability and may not discard relevant evidence.[27]

*Hall* reminds us that "the death penalty is the gravest sentence our society may impose," and that imposing this "harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being." Given these stakes, *Hall* warns that we must not make judgments in haste as to whether a person has an intellectual disability, but rather must consider all the "substantial and weighty evidence" in cases that present close questions. Put differently, we cannot risk making the protections of *Atkins* a nullity by executing a person with an intellectual disability without giving him the "fair opportunity to show the Constitution prohibits [his or her] execution."[28]

The Ninth Circuit appears to suggest that courts should initially inquire into a defendant's IQ score, and, if low enough, that mandates further analysis of prevailing medical standards as to a defendant's potential intellectual disability. But just like the tone of the U.S. Supreme Court, the tone of the Ninth Circuit suggests that IQ score cannot be the sole factor in determining whether a defendant has an intellectual disability that precludes a death sentence.

Guided by the U.S. Supreme Court's reasoning in *Moore,* we are constrained to conclude that KRS 532.130(2) is simply outdated. And while a mechanical use of this statute's bright-line rule promotes straightforward application and facilitates appellate review, it only provides the appropriate baseline information needed for judging intellectual disability. Lacking the additional consideration of prevailing medical standards, KRS 532.130(2)

---

[27] *Smith v. Ryan,* 813 F.3d 1175, 1181 (9th Cir. 2016) (internal citations omitted).
[28] *Id.* at 1191.

potentially and unconstitutionally exposes intellectually disabled defendants to execution.

We now conclude and hold that any rule of law that states that a criminal defendant automatically cannot be ruled intellectually disabled and precluded from execution simply because he or she has an IQ of 71 or above, even after adjustment for statistical error, is unconstitutional. Courts in this Commonwealth must follow the guidelines established by the U.S. Supreme Court in *Moore,* which predicate a finding of intellectual disability by applying prevailing medical standards.[29] Because prevailing medical standards change as new medical discoveries are made, routine application of a bright-line test alone to determine death-penalty-disqualifying intellectual disability is an exercise in futility.

In an attempt to provide guidance to courts confronting this issue, we shall attempt to fashion a rule. The U.S. Supreme Court in *Moore* favorably viewed what appears to be the "generally accepted, uncontroversial intellectual-disability diagnostic definition," akin to a totality of the circumstances test, and what KRS 532.130(2) seemingly reflects, "which identifies three core elements: (1) intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean'—*i.e.*, a score of roughly 70—adjusted for the 'standard error of measurement'; (2) adaptive deficits ('the inability to learn basic skills and adjust behavior to changing circumstances,'); and (3) the onset of these deficits while still a minor."[30] But where KRS 532.130(2) does not go

---

[29] It is important to note that the defendant still bears the burden of proving intellectual disability by a preponderance of the evidence. *Bowling,* 163 S.W.3d at 381-82 (internal citations omitted).

[30] *Moore,* 137 S.Ct. at 1045 (internal citations omitted); *see also supra,* n. 26.

far enough is in recognizing that, in addition to ascertaining intellectual disability using this test, prevailing medical standards should always take precedence in a court's determination.[31]

In this case, the Commonwealth concedes the need for a hearing in the trial court to determine if Woodall has a disqualifying intellectual disability. Woodall agrees, but further argues that this Court has all the information needed to adjudge Woodall intellectually disabled.

While it may be true that Woodall has presented evidence to this Court in support of his argument that he is intellectually disabled and should be rendered ineligible for the death penalty, we think the proper remedy is to afford both Woodall and the Commonwealth an evidentiary hearing at the trial court level. Remand for a hearing is particularly warranted because this Court has now declared unconstitutional KRS 532.130(2) and has established a new groundwork for a court's determination of this issue. So both parties should have the opportunity at the trial court level to present their respective arguments under the new standard we have articulated today.

### III.     CONCLUSION.

For the reasons discussed above, we reverse the ruling of the trial court and remand this case to the trial court to conduct a hearing consistent with this opinion.

---

[31] For example, in these types of cases, experts frequently testify as to the impact of the "Flynn Effect," which is apparently a recently discovered phenomenon that impacts a defendant's IQ score. These are the types of considerations, if proven to be prevailing medical standards, that should guide courts in determining whether an individual is constitutionally ineligible for the death penalty due to intellectual disability.

Minton, C.J., Hughes, Keller, VanMeter, Venters, and Wright, JJ., sitting. Minton, C.J.; Hughes, Keller, VanMeter, and Venters concur. Wright, J., concurs in part and dissents in part by separate opinion. Cunningham, J., not sitting.

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART: While I agree with the majority that this case needs to be remanded to the trial court for a hearing regarding Woodall's alleged intellectual disability, I respectfully dissent to its holding that KRS 532.130(2) is unconstitutional. The issues addressed by the majority opinion are good and reasonable resolutions as to future scientific or medical developments. However, the statute the majority overturns as unconstitutional currently complies with the DSM-5 (*Diagnostic and Statistical Manual of Mental Disorders* [DSM-5] published by the American Psychiatric Association) which is an established diagnostic standard. The prevailing medical consensus at any given time is subject to debate and would be difficult for trial courts to determine; however, the established diagnostic standards as set forth in the DSM-5 are undoubtedly accepted. It is simply too speculative to declare the statute unconstitutional due to the fact it may not comply with *future* medical or scientific discoveries. Therefore, I dissent.

I agree with the majority that flexibility to accommodate scientific development and changes is desirable. However, I do not believe there is a necessity to declare the statute unconstitutional on these grounds. The majority says the statute is unconstitutional regarding the death penalty because it uses a specific numerical floor for a defendant's IQ. However, since the statute complies with the DSM-5 guidelines, I would not go to the extreme measure of striking it.

Here, the score of 70 provides a floor for determining intellectual capacity for execution. Any defendant whose IQ falls below that floor is not subject to execution. However, the trial court still has a place in making the determination of intellectual disability for a defendant whose IQ scores above 70. Here, a psychiatrist testified Woodall was intellectually disabled. This testimony was enough to establish a prima facie showing, requiring the trial court to conduct a hearing and take proof from Woodall as to his disability.

Once a defendant establishes a prima facie case that he is ineligible for the death penalty due to an intellectual disability, then the trial court must conduct a full hearing to resolve the issue. Since this is a defense, it must be raised and proven by the defendant. A defendant would have to fully cooperate with an examination by the Commonwealth's expert in order that an adequate hearing could be conducted before the defendant could rely upon the defense. *White v. Commonwealth*, 500 S.W.3d 208, 210 (Ky. 2016) At the hearing, if the defendant has established a prima facie case that he is intellectually disabled and if he has fully cooperated with the Commonwealth's expert's examination then the burden of proof shifts to the Commonwealth to prove Woodall's capacity to be executed. "It is now elementary that the burden is on the government in a criminal case to prove every element of the charged offense beyond a reasonable doubt and that the failure to do so is an error of Constitutional magnitude." *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002).

Each element of a criminal case must be proven beyond a reasonable doubt and there can be factors that vary the score. The trial court must consider all the variables in determining if the defendant is intellectually

disabled. An example of such a factor that may affect the outcome is the margin of error, which this court ruled in *White* must be considered. Scientific evidence establishes that the current margin of error for the examination is 5 points above or below 70. Based upon the margin of error, an individual with a score of 66 might not be intellectually disabled, while someone with a score of 75 might be so disabled. Therefore, proof beyond a reasonable doubt requires a score of 76 to establish proof that a defendant is not intellectually disabled. This is the current established margin of error for the test. However, as testing improves the margin might decrease or additional scientific evidence might enlarge it. A trial court must consider the variable of the margin of error and any other variables that may prove or disprove intellectual disability beyond a reasonable doubt.

The statute complies with the current diagnostic standards, and trial courts must take other proof as to intellectual disability to determine whether a prima facie case is established. After a prima facie case is presented, the trial court must hold a hearing to determine beyond a reasonable doubt that a defendant is eligible for the death penalty.

The majority needlessly declares the statute at question unconstitutional, as the hearing outlined above resolves the issues with the statute that form the basis for the majority declaring it unconstitutional. Therefore, I do not believe this Court should take the extreme measure of declaring the statute unconstitutional. Woodall's constitutional rights are safeguarded by the hearing that will be conducted on remand without striking a statute enacted by the General Assembly.

COUNSEL FOR APPELLANT:

Timothy G. Arnold
Dennis James Burke
Assistant Public Advocate

Michael Jay O'Hara
O'Hara, Taylor, Sloan & Cassidy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jeffrey Allan Cross
Emily Lucas
Assistant Attorney General

# Supreme Court of Kentucky

2017-SC-000171-MR

ROBERT KEITH WOODALL          APPELLANT

ON APPEAL FROM CALDWELL CIRCUIT COURT
V.      HONORABLE CLARENCE A. WOODALL III, JUDGE
NO. 97-CR-00053

COMMONWEALTH OF KENTUCKY          APPELLEE

## ORDER DENYING PETITION FOR REHEARING

The Petition for Rehearing, filed by the Appellee, of the Opinion of the Court, rendered June 14, 2018, is DENIED. The Opinion of the Court, rendered June 14, 2018, is CORRECTED on its face by the substitution of the attached opinion. The correction does not affect the holding.

Minton, C.J.; Hughes, Keller, VanMeter, Venters, and Wright, JJ., sitting. All concur. Cunningham, J., not sitting.

ENTERED: December 13, 2018.

_____
CHIEF JUSTICE