RENDERED: MARCH 26, 2020
TO BE PUBLISHED



$\mathfrak{Supreme~Court~of~Kentucky}$

DATE 5/18/20

H Hutcheson

2014-SC-000725-MR

LARRY LAMONT WHITE                 APPELLANT

       ON REMAND FROM THE UNITED STATES SUPREME COURT

V.                        CASE NO. 17-9467

       JEFFERSON CIRCUIT COURT CASE NO. 07-CR-004230

COMMONWEALTH OF KENTUCKY            APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>REVERSING AND REMANDING</u>**

In 2014, Larry Lamont White was convicted of rape in the first degree

and murder for the 1983 killing of Pamela Armstrong. The jury recommended

a sentence of death for Armstrong's murder and twenty years' imprisonment for

the rape. After our affirmance of his matter of right[1] appeal, the United States

Supreme Court vacated the judgment, and remanded White's case back to this

Court for further consideration in light of *Moore v. Texas*, 137 S. Ct. 1039, 197

L. Ed. 2d 416 (2017), and its analysis regarding the execution of intellectually

disabled defendants. Since the Supreme Court's remand, White has also *pro se*

asked this Court to waive his intellectual disability claim, so he can move

---

[1] Ky. Const. § 110(2)(b).

forward with post-conviction proceedings. After additional review of the record, and recent Kentucky and federal case law, we hold that—due to his death sentence—White may not *pro se* waive his pending intellectual disability claim. Further, based on the holdings of *Moore* and *Woodall v. Commonwealth*, 563 S.W.3d 1 (Ky. 2018), White has produced enough evidence to form a reasonable doubt as to his intellectual capabilities so as to warrant a hearing on the issue. Thus, we remand this case to the Jefferson Circuit Court with instructions to conduct an evidentiary hearing on White's intellectual disability claim.

## I. Factual and Procedural Background.

The facts of this case are set out by this Court in its original opinion as follows:

> Armstrong was murdered on June 4, 1983. Her body was discovered that same day in a public alley, with her pants and underwear pulled down around her legs and shirt pulled up to her bra line. She suffered from two gunshot wounds. One wound was observed on the left side of the back of her head, while the other wound was in virtually the same spot on the right side. The medical examiner was unable to determine which shot was fired first, but did opine that neither shot alone would have caused immediate death.
>
> Although Appellant was originally a suspect, Armstrong's murder remained unsolved for more than twenty years. Yet, in 2004, the Louisville Metro Police Department ("LMPD") Cold Case Unit reopened Armstrong's case. Through the use of DNA profiling, Detectives sought to eliminate suspects. LMPD officers were able to obtain Appellant's DNA from a cigar he discarded during a traffic stop. Appellant's DNA profile matched the DNA profile found in Armstrong's panties.
>
> On December 27, 2007, a Jefferson County Grand Jury returned an indictment charging Appellant with rape in the first degree and murder. During the trial, DNA evidence and evidence of Appellant's other murder convictions were introduced to the jury. On July 28, 2014, Appellant was found guilty of both charges.

Appellant refused to participate during the sentencing stage of his trial. The jury ultimately found the existence of aggravating circumstances and recommended a sentence of death for Armstrong's murder plus twenty years for her rape. The trial court sentenced Appellant in conformity with the jury's recommendation. Appellant now appeals his conviction and sentence as a matter of right pursuant to § 110(2)(b) of the Kentucky Constitution and Kentucky Revised Statute ("KRS") 532.075.

*White v. Commonwealth*, 544 S.W.3d 125, 133 (Ky. 2017), as modified (Mar. 22, 2018), *cert. granted, judgment vacated sub nom. White v. Kentucky*, 139 S. Ct. 532, 202 L. Ed. 2d 643 (2019), and *abrogated by Woodall v. Commonwealth*, 563 S.W.3d 1 (Ky. 2018).

One year after our decision in *White*, we held that KRS[2] 532.130(2)—the statute requiring a showing of an IQ of 70 or less to determine intellectual disability—was unconstitutional. *Woodall*, 563 S.W.3d at 2. When the United States Supreme Court remanded White's case to this Court for reconsideration in light of *Moore v. Texas*, 137 S. Ct. 1039, this Court ordered supplemental briefing on the issue. White then *pro se* sent a letter to the Attorney General, stating his disagreement with his attorneys' decision to pursue an intellectual disability defense. Thereafter, White *pro se* filed a "motion" with this Court objecting to the intellectual disability defense "asking this Court to dismiss the issue[,]" as he was not "retarded" nor "guilty of this crime." White subsequently filed additional "motions" that both assert similar arguments attempting to waive the intellectual disability claim before this Court. We directed both White's appellate counsel and the Commonwealth to file

---

[2] Kentucky Revised Statutes.

supplemental briefs regarding White's ability to waive this claim. Both briefs were filed, and both issues are now ripe for determination.

## II. A Defendant Cannot Waive a Pending Claim of Intellectual Disability in a Death Penalty Case.

The Commonwealth argues that White has the ability to *pro se* waive his claim of intellectual disability currently pending before this Court. White's attorneys disagree. Both sides discuss, at length, the relationship between attorney and client, and White's Sixth and Eighth Amendments rights. However, we need not decide the broader attorney-client question of whether a defendant can *pro se* waive any pending or potential claim because we hold that *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), and its progeny—extending to *Moore*—have placed an absolute bar against imposing the death penalty on the intellectually disabled.

"The Eighth Amendment of the United State Constitution prohibits the execution of a person who has an intellectual disability." *Woodall*, 563 S.W.3d at 2–3 (citing *Hall v. Florida*, 572 U.S. 701, 704, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014); *Atkins*, 536 U.S. at 321). The United States Supreme Court in *Hall v. Florida* held that some punishments are prohibited by the Eighth Amendment "as a categorical matter." *Id.* at 708. These punishments include 1) the denaturalization of a natural-born citizen; 2) sentencing a juvenile to death; and 3) sentencing "persons with [an] intellectual disability" to death. *Id.* The Supreme Court expounded in *Moore* that "the Constitution 'restrict[s] . . . the State's power to take the life of' *any* intellectually disabled

individual." 137 S. Ct. at 1048 (quoting *Atkins*, 536 U.S. at 321). We take the *Moore* court's emphasis on "any" to include any individual who has not yet been determined to have an intellectual disability, but who is entitled to an evidentiary hearing by showing "some evidence creating a [reasonable] doubt as to whether he is [intellectually disabled]." *Wilson v. Commonwealth*, 381 S.W.3d 180, 186 (Ky. 2012) (citation omitted); *see also Brumfield v. Cain*, 135 S. Ct. 2269, 2281, 192 L. Ed. 2d 356 (2015) (favorably reviewing a Louisiana statute which required a defendant to show a "reasonable doubt as to his intellectual disability to be entitled to an evidentiary hearing[]") (citation omitted).

*Moore* further held that "[m]ild levels of intellectual disability, although they may fall outside Texas citizens' consensus, nevertheless remain intellectual disabilities, and States may not execute anyone in 'the *entire category* of [intellectually disabled] offenders[.]'" 137 S. Ct. at 1051 (quoting *Roper v. Simmons*, 543 U.S. 551, 563–64, 125 S. Ct. 1183, 1192, 161 L. Ed. 2d 1 (2005) (citations omitted) (emphasis added)). Thus, when a punishment is prohibited by the Eighth Amendment blocking an entire category of individuals from a certain penalty, and evidence has been established creating a reasonable doubt as to whether a defendant is a member of that category, the issue cannot be waived. Accordingly, as discussed *infra*, because White has met his burden to receive an evidentiary hearing on his intellectual disability claim, this Court cannot allow him to *pro se* waive this issue, as that would

impose the death penalty on a potentially intellectually disabled defendant—something the Commonwealth is without power to do.

### III. White has Met the Burden to Receive an Evidentiary Hearing Regarding his Intellectual Capacity.

This Court was specifically directed to review White's intellectual disability claim under the standard set forth in *Moore*, 137 S. Ct. 1039. We last reviewed *Moore* in *Woodall*, wherein we declared KRS 532.130(2) unconstitutional, holding that "a criminal defendant automatically cannot be ruled intellectually disabled and precluded from execution simply because he or she has an IQ of 71 or above, even after adjustment for statistical error[.]" 563 S.W.3d at 6. Thus, as a preliminary matter, the statute we reviewed White's initial appeal under is no longer good law.

This Court, based on *Moore*, created the *Woodall* test to provide guidance to all future courts of this Commonwealth analyzing a claim of intellectual disability. *See id.* at 6–7 (citing *Moore*, 137 S. Ct. at 1045). Under the *Woodall* test, a defendant must show "(1) intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean'—*i.e.,* **a score of roughly 70**—adjusted for the 'standard error of measurement'; (2) adaptive deficits ('the inability to learn basic skills and adjust behavior to changing circumstances,'); and (3) the onset of these deficits while still a minor." *Id.* at 6–7 (quoting *Moore*, 137 S. Ct. at 1045) (emphasis added). Lastly, "in addition to ascertaining intellectual disability using this test,

prevailing medical standards should always take precedence in a court's determination." *Id.* at 7.

Under the first prong of the *Woodall* test, White has produced two separate IQ scores obtained before he turned 18. In 1971, when White was 12-years old, he was administered the Wechsler Intelligence Scale for Children ("WISC") and achieved a full-scale IQ of 76. Adjusted for the standard error of measurement, White's IQ score range was 71-81. While the Commonwealth argues that White's IQ range based on his WISC score does not warrant an evidentiary hearing, a 71 is as close as possible to being "roughly" 70. *Id.* at 6. Even assuming, *arguendo*, that 71 is not "roughly" 70, White has also produced another score. White was administered the Otis Quick-Scoring Mental Ability Test ("Otis"), scoring a 73, soon after he was administered the WISC test. Adjusted for the standard error of measurement, White's IQ score range for the Otis test was 68-78, well within the requirements of the first *Woodall* prong and earned while he was a minor, thus meeting *Woodall's* third prong. *Id.* at 7.

The Commonwealth contends that experts consider the Otis exam to be both unreliable and unacceptable for purposes of determining intellectual disability. *See* John H. Blume et al., *Protecting People with Intellectual Disability from Wrongful Execution: Guidelines for Competent Representation*, 46 Hofstra L. Rev. 1107, 1118–20 (2018) (discussing certain pitfalls of the Otis examination). However, this is the opposite argument the Commonwealth took regarding Otis IQ scores in *Bowling v. Commonwealth*, 163 S.W.3d 361, 384

(Ky. 2005) ("*Bowling IV*"),[3] wherein the Commonwealth advocated and this Court accepted that two Otis IQ scores of 84 and 79 (the only two test scores taken while the defendant was a juvenile) were enough evidence to defeat the defendant's intellectual disability claim. *See also Smith v. Ryan*, 813 F.3d 1175, 1184–86 (9th Cir. 2016) (In *Smith*, previously cited favorably by this Court in *Woodall*, the Ninth Circuit reduced a sentence of death to life imprisonment based partially on the defendant's Otis test scores). While the Otis test may have its critics, a deeper analysis of White's IQ scores is best reserved for an evidentiary hearing at which time both sides can fully develop a record regarding White's two scores, his adaptive deficits or lack thereof, and consideration of the prevailing medical standards regarding intellectual disabilities.

*Woodall's* second prong, adaptive deficits, is less developed in this case than previous cases in front of our Court. Most of the evidence concerning this prong stems from the same time period as White's IQ scores. This is most likely because White has spent all but four of forty-three years of his adult life behind bars and has not had an evidentiary hearing which could have established these deficits or had a medical professional observe his behavior to the extent necessary to document adaptive deficits or lack thereof. White did have issues adapting to school and never succeeded there. He was graded as

---

[3] These Otis scores were also cited more recently in a different opinion on Bowling's case before this Court. *Bowling v. Commonwealth*, 377 S.W.3d 529, 537 (Ky. 2012).

reading at a 2.4 grade level and doing arithmetic at a 3.4 level while he was in sixth grade. He was frequently truant. He was also observed to show "a fairly primitive level of socialization," and distanced himself from family and friends. While the lack of facts regarding any recent evidence of adaptive deficits is troublesome, this is exactly what evidentiary hearings are designed for: to gather more facts and expert assistance to explore whether further evidence of adaptive deficits is revealed. At the very least—combined with his low-end IQ scores achieved while still a minor—White's potential adaptive deficits and lack of any substantial contact with the outside world during adulthood warrant further consideration in the form of an evidentiary hearing at the trial court level.[4] Finally, *Moore* requires courts to "consult current medical standards to determine intellectual disability," and we direct trial courts to review the *Woodall* test in light of the prevailing medical standards at the time of the evidentiary hearing. 137 S. Ct. at 1048; 563 S.W.3d at 7. Thus, adherence to previous judicial authority analyzing medical standards in this realm is only mandatory if it still comports with **current** medical standards.

---

[4] *See Moore,* 137 S. Ct. at 1050 (discussing that current medical professionals "caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is. [Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition 38 (2013)] ('Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.'); *see* [American Association on Intellectual and Developmental Disabilities Clinical Manual, Eleventh Edition 20 (2010)] (counseling against reliance on 'behavior in jail or prison')").

## IV. White's Concerns Regarding His Counsel.

White has shown a tendency to not cooperate with counsel and has *pro se* asked this Court to replace his current counsel multiple times. While we are not a fact-finding court, we acknowledge White's displeasure with his current and former counsel, as well as his lack of participation in the proceedings below. If, on remand, White persists in expressing disagreement with his counsel's representation concerning his appeal, he may request an evidentiary hearing regarding his competency to self-represent. *See Commonwealth v. Mason*, 130 A.3d 601, 671 (Pa. 2015) (discussing options for intellectual disability claimant who disagrees with counsel's choice to pursue *Atkins* defense).

## V. Conclusion.

Since *Woodall* declared our statutory scheme in this area unconstitutional under *Moore* and *Hall*, White's evidence suffices the reasonable doubt standard entitling him to an evidentiary hearing on the matter of his potential intellectual disability. His adjusted IQ scores of 71 and 68 from when he was 12, alone are enough to form a reasonable doubt as to his intellectual capacity. Whether he has met the preponderance of the evidence standard[5] is a separate question to be analyzed by the trial court as a fact finder through the evidentiary hearing process. As no hearing has

---

[5] "It is important to note that [even after receiving an evidentiary hearing] the defendant still bears the burden of proving intellectual disability by a preponderance of the evidence." *Woodall*, 563 S.W.3d at 6 n.29 (citation omitted).

occurred, this Court withholds judgment until a hearing has been conducted and a determination made.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Timothy G. Arnold
Director, Post Trial Division
Department of Public Advocacy

Kathleen Kallaher Schmidt
Susan Jackson Balliet
Erin Hoffman Yang
Assistant Public Advocates
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Stephanie Lynne McKeehan
Assistant Attorney General

Emily Lucas
Assistant Attorney General

# Supreme Court of Kentucky

## 2014-SC-000725-MR

LARRY LAMONT WHITE                                             APPELLANT

                 ON REMAND FROM THE UNITED STATES SUPREME COURT
V.                              CASE NO. 17-9467
                 JEFFERSON CIRCUIT COURT CASE NO. 07-CR-004230

COMMONWEALTH OF KENTUCKY                          APPELLEE

## ORDER DENYING APPELLANT'S MULTIPLE MOTIONS TO WAIVE CLAIM OF INTELLECTUAL DISABILITY

Based on our published opinion in this case dated March 26, 2020,

Appellant's multiple motions to waive his claim of intellectual disability are

DENIED.

All sitting. All concur.

       ENTERED: March 26, 2020.

CHIEF JUSTICE